IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| DONNA SUMNER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-0945-CV-W-NKL-SSA |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Before the Court is Plaintiff Donna Sumner's Social Security Complaint [Doc. # 3]. Sumner alleges she became disabled beginning January 17, 2006, due to injured discs in her lower back and anxiety. Sumner argues that the Administrative Law Judge ("ALJ") erred in 1) affording little weight to the opinion of treating physician Dr. Ross; 2) not properly calculating Sumner's Residual Functional Capacity; and 3) giving little probative weight to Sumner's testimony. The Court finds that the ALJ erred in improperly disregarding the treating opinion of Dr. Ross and remands the case for reconsideration in accord with this Order.

**I.     Medical Evidence[1]**

Plaintiff was born in 1964, and alleges an onset of disability on January 17, 2006. In May 2005, Sumner underwent an MRI of her lumbar spine that revealed advanced

---

[1] The facts and arguments presented in the parties' briefs are duplicated here only to the extent necessary. Portions of the parties' briefs are adopted without quotation designated.

degenerative disc disease at L4-5 with posterior disc protrusion and compromise of the left L5 nerve root, and bulging discs at L3-4 and L5-S1. (Tr. at 253). She reported to Dr. Ross that her pain worsened when she lifted a box, and he noted decreased range of motion with tenderness to palpation. (Tr. at 243). She was prescribed Flexeril, Vicodin, and Motrin. (Tr. at 243). She reported to Dr. Ross again in September 2005 with back pain and muscle spasms and Dr. Ross noted tenderness to palpation. (Tr. at 240). He refilled her medications. *Id.* In January 2006, Sumner reported that she was working at Subway and she went to lift and move some heavy boxes, and she felt the onset of lower back pain that radiated down into her left leg. (Tr. at 219). On January 25, 2006, Sumner underwent an MRI of her lumbar spine that again showed advanced degenerative disc disease at L4-5 with left nerve root compromise and disc protrusion. (Tr. at 214). That same month Sumner presented to Dr. Ross to discuss her injury, and she noted to him that lifting was painful. (Tr. at 238). In February 2006, Sumner again met with Dr. Ross to discuss her treatment options for her back injury and pain. After consulting with Sumner, Dr. Ross recommended she undergo a physical therapy evaluation. (Tr. at 237). Also in February 2006, Sumner reported to Lafayette Regional Health Center with back pain and radicular pain. (Tr. at 307-16). She was scheduled to undergo an EMG of her lower extremities, but an epidural injection resolved the lower extremity pain and Sumner was instructed to reschedule the testing if the pain returned. (Tr. at 312). A few months later, Sumner completed one session of physical therapy, but reported it was too painful to continue so she was referred to an orthopedic surgeon. (Tr. at 265-68). Sumner met

2

again with Dr. Ross in May 2006, where she reported severe lumbar pain with weakness in her lower extremities. (Tr. at 237). Dr. Ross scheduled a follow-up with Dr. Miles at the Columbia Orthopaedic Institute.

Sumner met with Dr. Miles on May 25, 2006, for an evaluation of her injury. She reported back and leg pain, with the leg pain radiating down outside her right ankle. (Tr. at 210). She reported that standing was better than lying down. (Tr. at 210). Prior to her consultation with Dr. Miles, Sumner had undergone three epidural steroid injections in January and February that had provided only minimal and temporary relief. (Tr. at 210). Dr. Miles observed a normal mood and affect with a positive sitting straight leg raise on the right at fifteen degrees. (Tr. at 211). On examination, Sumner was limited in bending, able to reach just to her knees with disturbed spinal rhythm. (Tr. at 211). Sumner underwent another MRI that same day that revealed an extruded disk at L5-S1, right paracentral abutting the S1 nerve root, and a focal protrusion with degenerative disc disease and annular bulging. (Tr. at 211). Dr. Miles noted that Sumner's pain and symptoms were consistent with the type of injury she sustained, and he recommended surgical intervention. (Tr. at 212). She was prescribed Ultracet. (Tr. at 212). Sumner continued to follow up with Dr. Ross through 2006 and into 2007, including an appointment in October 2006 where she reported an increase in back spasms. (Tr. at 235). Dr. Ross refilled her pain medications, including Flexeril and Ibuprofen. (Tr. at 229-33).

In April 2007, Sumner presented to Carroll County Memorial Hospital with reports of recurring bladder problems. (Tr. at 271). She reported abdominal pain and fullness. (Tr. at 271). In June 2007, Sumner presented again to Dr. Ross for a consult about her ongoing back pain. (Tr. at 232).

The following summer, Sumner underwent another evaluation for her back pain by Dr. James Stuckmeyer. She reported to Dr. Stuckmeyer that she had been injured on the job in January 2006, and had not worked since that date. (Tr. at 219). Dr. Stuckmeyer noted a history of back pain that pre-dated Sumner's injury, with a motor vehicle accident in 2004 and a work-related injury in 2005. (Tr. at 220-21). Physical exam revealed tenderness at L4-5 and L5-S1 right greater than the left. (Tr. at 222). Sumner had good range of motion in her lumbar spine with a normal gait but tenderness over the right sciatic notch. (Tr. at 222). Dr. Stuckmeyer reported that with a reasonable degree of medical certainty, Sumner's pain and injury had occurred during the incident she described in January 2006. He also reported that her injury warranted surgical intervention. (Tr. at 222).

Later in 2008, Sumner followed up with Dr. Ross, who noted a history of injections and back pain. (Tr. at 225). In November 2008, Sumner reported to the emergency room at Carroll County Memorial Hospital with anxiety and a day-long history of nervous feelings. (Tr. at 279). She was given Ativan in the ER, and her symptoms improved slightly. (Tr. at 279). Following this, Sumner followed up with Dr.

4

Ross regarding her anxiety, and Dr. Ross monitored her symptoms, prescribing her Xanax and Klonopin. (Tr. at 353-355).

In April 2010, Sumner presented to the emergency room with a two-day history of headache that was growing more intense. (Tr. at 358). She underwent some tests, and was prescribed medication. In July 2010, Sumner was diagnosed with cholelithiasis. (Tr. at 357).

With regard to the opinion evidence, Dr. Keith Allen, PhD, completed a Psychiatric Review Technique on July 17, 2009, in which he opined that Sumner did not have a medically determinable psychiatric impairment. (Tr. at 327). That same month, La'Kedra Coleman from Disability Determinations completed a Physical Residual Functional Capacity assessment in which she opined that Sumner would be capable of light work, but would be limited to occasional postural maneuvers and no crawling, and she would need to avoid concentrated exposure to hazards and moderate exposure to vibrations. (Tr. at 338-343).

Dr. Marvin Ross, Sumner's primary care provider, also completed a statement regarding Sumner's limitations on September 17, 2010. Dr. Ross noted that Sumner experienced a severe decrease in flexion and lumbar extension due to pain. (Tr. at 359). He also noted that she had positive straight leg raises in the supine position and was often tender to palpation. (Tr. at 359). With regard to Sumner's limitations, Dr. Ross assessed that she should be afforded the opportunity to change positions at will, and should be able to lay down during the day as needed to relieve pain, as well as avoid bending, twisting,

reaching, climbing, stooping, and crouching. (Tr. at 359). Dr. Ross stated that Sumner would be limited to lifting no more than ten pounds, and could only do so occasionally. (Tr. at 359).

**B.      Administrative Hearing**

On October 10, 2010, Sumner testified at a hearing before Administrative Law Judge Linda Sybrant. (Tr. at 24-46). Sumner testified that she could not work because of her back pain and her anxiety. (Tr. at 32). She stated that she could not bend very far, could not stand for more than thirty minutes, could not sit for more than fifteen to twenty minutes, and had a hard time lifting a gallon of milk. (Tr. at 32). Sumner also testified that it was hard for her to do everyday activities like unloading the dishwasher and carrying her own laundry baskets. (Tr. at 33). She stated that she had a driver's license and drove occasionally. (Tr. at 32).

With regards to her pain, Sumner testified that she had pain in her low back and legs that did not go away. (Tr. at 33). She stated that her pain was normally a five of ten, but got as bad as a ten on occasion. (Tr. at 33). She also testified that she got leg pain two to three times per week and she could not predict when it would come on, but it was generally worse when she was standing or walking. (Tr. at 33). To relieve the pain, Sumner testified that she saw a chiropractor, iced her lower back and elevated her legs in addition to taking pain medications. (Tr. at 34). She stated that she spent about two to three hours each day in her recliner, which helped relieve the pressure on her back and legs. (Tr. at 34).

With regard to her mental impairments, Sumner testified she had experienced anxiety for years, and started getting treatment with Dr. Ross. (Tr. at 31). She stated he prescribed her Xanax and Klonopin, which helped her some. (Tr. at 31). Sumner also stated that she was unsure if she could mentally perform work, because she was afraid of the effect work activity would have on her pain. (Tr. at 35). She stated she was taking online classes because she knew she would not be able to sit in a classroom all day without frequent breaks. (Tr. at 35).

Sumner further testified that she had about two to three bad days per week, and on those days she was not able to accomplish much of anything aside from sitting in her recliner. (Tr. at 36). On good days, Sumner testified that she had to cram a lot in, including household chores and studies. (Tr. at 36). She stated that she had problems with focus and concentration as a result of the pain and anxiety, and she experienced panic attacks on occasion. (Tr. at 37-38).

With regard to sleep, Sumner testified that she was unable to lay flat on her back, and she tossed and turned at night. (Tr. at 39). She stated she took naps in her recliner of about one to two hours each time. (Tr. at 39). Because of the pain, she testified she was no longer able to do yard word or tend to her flower garden. (Tr. at 40).

### C. ALJ Decision

As for severe impairments, the ALJ determined that Sumner had the severe impairment of degenerative disc disease. (Tr. at 12). She determined that Sumner's anxiety was not a severe impairment, and Sumner's impairments did not meet or equal a

7

Case 4:11-cv-00945-NKL   Document 13   Filed 08/17/12   Page 7 of 15

listing. (Tr. at 13-14). The ALJ then concluded that considering Sumner's severe limitations, she had the capacity to lift twenty pounds frequently, ten pounds occasionally, stand or walk two hours of eight, she would need to be permitted to alternate sitting and standing once or twice per hour, she could never climb ladders, ropes, or scaffolds, and could only occasionally stoop, crouch, crawl, kneel, and climb, and would need to avoid concentrated exposure to extreme cold or vibration. (Tr. at 14).

The ALJ stated that the RFC was supported by the substantial evidence, and she was discrediting the report from Dr. Ross and Sumner's own testimony about her limitations because Dr. Ross's opinion was inconsistent with his treatment notes, and Sumner's activities of daily living were not consistent with total disability. (Tr. at 117). The ALJ then re-articulated the RFC that Sumner could lift twenty pounds frequently and ten pounds occasionally, and relied on vocational testimony to determine that while Sumner was not capable of her past work, she would be able to perform such occupations as optical good assembler (DOT # 713.687-018), wire patcher (DOT # 723.687-010), and surveillance systems monitor (DOT # 379.367-010).

## II. Discussion

### A. Legal Standard

In reviewing the Commissioner's denial of benefits, the Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v.*

8

*Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue,* 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (*quoting Nicola*, 480 F.3d at 886).

### B. Opinion of Treating Physician

Sumner challenges the ALJ's discounting of the assessment of Sumner's treating physician, Dr. Ross. A treating physician's opinion is generally entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2008). By contrast, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Id*. When assessing the weight to be afforded to medical opinions, the ALJ is required to consider the nature and extent of the treatment relationship; the length of treatment and frequency of examination; the supportability of the opinion; the consistency of the opinion; and the specialization of the doctor, among other factors. 20 C.F.R. 404.1527(c). An ALJ must "give good reasons" for discounting a treating physician's opinion. *Dolph v. Barnhart*, 308 F.3d 876, 879 (8th Cir. 2002).

Here, the ALJ gave little weight to Dr. Ross' treating opinion, claiming that it was inconsistent with his own treatment notes and the record as a whole. The only apparent

9

inconsistency cited by the ALJ was Dr. Ross' statement that "during his examinations, the claimant's straight leg raising tests have been positive." [Tr. 17]. The ALJ then stated that "that is not reflected in his treatment notes and multiple reports in the record found negative straight leg raising tests." *Id.*

The ALJ's comments are an insufficient basis for discounting Dr. Ross' treating opinion for at least two reasons. First, the ALJ's interpretation of Dr. Ross' opinion as inconsistent appears to be based on an out-of-context reading of his words. Dr. Ross in his assessment letter did mention that Sumner had exhibited positive, straight leg raising in the supine position; however, from a review of this statement, it does not appear that he was claiming that these tests had always been positive. Rather, it appears that he was simply listing one symptom–the presence of positive straight leg raising-- to support his conclusions of Sumner's limitations related to her back impairment. An evaluation of the relative importance of different test results, and the decision to view one particular test result as being more indicative of a patient's true physical condition than another is primarily a diagnostic function and the province of the treating physician, not the ALJ. Further, there is no evidence to indicate that Dr. Ross relied exclusively on the presence of this positive test to account for Sumner's limitations. Along with the mention of the positive straight leg raising, Dr. Ross also noted Sumner's severe decrease in flexion with considerable pain in extension; her tenderness to palpation in the right sacroiliac joint; and the chronic nature of her low back pain. Further, his treatment notes over his five years of treating Sumner reveal a long history of degenerative disc disease, back spasms;

10

increasing pain; and the need for surgery, among other findings. The ALJ's apparent isolation of a single comment by Dr. Ross at the expense of a more comprehensive review of his medical opinion is insufficient as a basis for discounting his opinion.

Second, a review of the record of other physicians who examined Sumner reveals significant consistencies with the findings of Dr. Ross. Another doctor, Dr. Miles, also noted a positive straight leg raise, though in a sitting position, as well as tenderness to palpation, bending problems, and the need for surgical intervention. He also noted that Sumner's pain and symptoms were consistent with the type of injury she sustained. MRI results also appear to support diagnoses of degenerative disc disease. A third physician, Dr. Stuckmeyer, also noted tenderness across the lumbar spine and agreed with the other two physicians that surgery would be necessary, though he did also note the presence of negative straight leg raising tests. (Tr. 222). However, one example of differing test results between two different physicians is not sufficient to declare the opinion of Dr. Ross, a physician who had treated Sumner for over five years, inconsistent with the record, particularly when it is not clear from the decision whose medical opinion was in fact relied upon by the ALJ after Dr. Ross' opinion was afforded little weight. If the ALJ had a solid basis in the medical record for disregarding Dr. Ross' opinion solely on account of the differing results of the straight leg raising tests, or if there was other compelling evidence she also found inconsistent, she should have explained her reasoning and provided further citations to the medical record which would support the dismissal of Dr. Ross' findings in favor of those of another physician. *See Ness v. Sullivan*, 904 F.2d

11

432, 435 (8th Cir. 1990) (stating that the ALJ cannot substitute his own opinion for that of treating physicians). Given the apparent consistencies noted above, as well as the importance placed upon the opinion of a treating physician, the ALJ cannot afford little weight to the opinion of Dr. Ross without providing more explanation of how his findings were at odds with the medical record.

For the foregoing reasons, the ALJ erred in affording little weight to the opinion of Sumner's treating physician Dr. Ross and therefore the case must be remanded for reconsideration according to the Court's discussion above.

### C. Residual Functional Capacity.

Because the ALJ improperly weighed the medical opinion of Dr. Ross, as discussed above, the Court finds that the ALJ also improperly determined Sumner's Residual Functional Capacity and must reformulate it upon remand after re-weighing the medical evidence. In particular, the ALJ should specifically state what medical opinions and evidence she has weighed when formulating the RFC. Sumner further challenges the ALJ's lifting restrictions as being inconsistent with the ALJ's determination that Sumner was restricted to less than sedentary work. She also argues that the ALJ failed to address Sumner's mental impairments or obesity in assessing the RFC. Upon remand, the ALJ should address these issues, defining Sumner's limitations with precision and including a discussion of how all of Sumner's determined impairments factor into the RFC.

### D. Credibility

12

Sumner also challenges the ALJ's credibility finding. When an ALJ determines that a claimant is not credible, the ALJ must provide specific reasons for his credibility finding. *See Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991). The factors to be considered are set out in *Polaski v. Heckler*, which requires the ALJ to give full consideration to all of the evidence presented relating to subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to matters such as: 1) the claimant's daily activities; 2) the duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness, and side effects of medication; and 5) functional restrictions. 739 F.2d 1320, 1321-22. "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." *Id.*

The ALJ based her credibility decision upon several factors, including her finding that Sumner's treatment had been routine and conservative and that she was able to continue her activities of daily living. She also noted that Sumner's ability to take classes suggested she was not as limited as alleged. [Tr. 16-17]. Sumner argues that the ALJ's finding of conservative treatment was improper, pointing to statements by three physicians that surgical intervention would be necessary, as well as Sumner's own testimony that the only reason she did not get surgery was because her insurance company would not approve it. [Tr. 30]. Further, Sumner argues that the ALJ improperly found that Sumner was able to continue her activities of daily living. In particular, she

13

claims that the ALJ ignored Sumner's subjective testimony that she had difficulty completing daily activities, as well as her testimony that she took online classes because she was not able to sit in a regular classroom setting due to her impairments. [Tr. 28, 35]. As the required reevaluation of Dr. Ross' opinion will require the ALJ to also reevaluate Sumner's credibility in light of the full medical record, the ALJ can take into account these issues upon remand.

### III. Conclusion

It is hereby ORDERED that the matter be REMANDED to the ALJ for reconsideration consistent with this Order.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: August 17, 2012
Jefferson City, Missouri

15